UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

FOLEY SQUARE DIVISION

1:17-cr-00251-PGG-3

UNITED STATES OF AMERICA

vs

HIRAM COLLAZO # 79046-054
Defendant.

---

APPLICATION FOR MODIFICATION OF SENTENCE

PURSUANT TO 18 U.S.C. SECTION 3582 (c) (1) (A) (i)

AS A RESULT OF COVID-19

---

Hiram Collazo # 79046-054

Metropolitan Detention Center

P. O. Box 329002

Brooklyn, NY 11232

The Government is directed to respond by Monday, May 18, 2020 at 5:00 p.m.

SO ORDERED.

*Paul G. Gardephe* (signature)

Paul G. Gardephe
United States District Judge
May 13, 2020

1

## PRELIMINARY STATEMENT

In light of the extreme danger posed by COVID-19, Hiram Collazo (hereinafter the Defendant) submits the instant application under 18 U.S.C. Section 3582 (c) (1) (A) (i) to request that the Court decrease the Defendant's sentence by 51 months (from 70 months to 19 months), which will cause him to be immediately transferred from his place of confinement at MDC Brooklyn to home confinement, or, in the alternative, to allow the Defendant to go to home confinement on furlough until the COVID-19 pandemic is under control, and then, to resume his unfinished term of imprisonment until completion. A furlough will not decrease the Defendant's sentence, but it will delay the start of imprisonment.

The Defendant is presently incarcerated at MDC Brooklyn, Brooklyn, New York, and he is housed in a unit with several other inmates in very close quarters. The Metropolitan Detention Center, Brooklyn (MDC Brooklyn) is a United States federal administrative detention facility in the South Slope neighborhood of Brooklyn, New York City. It holds male and female prisoners of all security levels. Most prisoners held at MDC Brooklyn have pending cases in the United States District Court for the Eastern District of New York. MDC Brooklyn also holds prisoners serving brief sentences. By February 2019, 1,600 prisoners were held in MDC Brooklyn. In 1999, a second facility was opened adjacent to the original complex to house inmates who have already been sentenced and are awaiting transfer to a permanent facility. This brought the total number of inmates to close to 3,000 and made MDC Brooklyn the largest detention center in the United States.

Thus, the Defendant stays in the MDC Brooklyn facility with inmates that have been sentenced and are awaiting transfer to a permanent facility. There are several hundred inmates that have been sentenced and are awaiting transfer to a permanent facility, but permanent

facilities are not accepting inmates, the BOP is not transferring inmates, and the Defendant is stuck at MDC Brooklyn "awaiting a death sentence". Blogger Walter Paulo, on March 22, 2020, wrote an article for Personal Finance in which he reported the following:

### The COVID-19 Prison Crisis is about to become a Community Crisis

> David Sanon, who works at MDC Brooklyn, said that the prison staff is in need of masks, soap and hand sanitizer. He also indicated that despite the BOP's 30-day suspending transfers of inmates said, "They [BOP] is moving inmates and they need to stop all movement." The BOP has since updated their website stating that they are moving inmates but only after they have been evaluated to make sure they exhibit no signs of COVID-19. As we all know now, symptoms like fever and shortness of breath may come many days after initial infection.
> Patton, who has worked tirelessly over the past few weeks on issues related to the Bureau of Prisons' response to COVID-19, said that of the nearly 2,000 inmates at MDC Brooklyn and MCC New York, nearly over one-third (nearly 700) profile as those who are at risk of developing a severe illness. There are over 170,000 inmates in the federal prison system ... with the same ratio Patton cited it means that the BOP has over 50,000 inmates that are at high risk of serious illness. Further complicating this issue is that prisons like MDC are unsanitary and are, even in sanitary conditions, susceptible to contagion. "There is no way for inmates to do social distancing," Patton said.

Since that article was posted, there have been several more inmates and staff that have tested positive for the COVID-19 at the MDC Brooklyn. Most of the staff at the MDC Brooklyn wear PPE's (gloves and mask), and, the inmates have been provided with masks but are not required to wear them. Social distancing and sheltering in cannot and is not practice at this institution; because; the inmates sleep, work, eat, and live in very close quarters. Since no alcohol is permitted in the facility, there are no alcohol-based hand sanitizers. While soap is available, the common showers that every inmate is forced to use are not cleaned any more frequently as a result of the pandemic. Inmates are required to use the computers and phones to communicate with family and friends, but neither is cleaned often. There is no separate area at MDC Brooklyn for the sick inmates to self-quarantine, so the Defendant is forced to sleep in bunk beds right next another inmate (within 6 feet of him). Inmates, like the Defendant, are

3

housed in cells with two or more bunks. Each inmate at the facility is given one toilet tissue per week; no soap, and no medical attention. Several inmates get to use one phone during a 30-minute break; and even though, four inmates recently tested positive for COVID-19 but they were not removed from their cell with others.

The Defendant has made request to the Warden of the institution for compassionate release due to the virus, and the Warden denied the request. If the Defendant has not already contracted COVID-19 by the time this application is filed, he is almost certain to contract it within the next few days unless immediate action is taken. The Defendant is 22 years old. The exigency circumstances caused by this deadly virus present extraordinary and compelling reasons to take action.

Accordingly, the Defendant respectfully requests that the Court issues an Order pursuant to 18 U.S.C. Section 3582 (c) (1) (A) (i) to decrease the Defendant's sentence by fifty-one (51) months so that he may be immediately placed on home confinement to serve the remaining months of his sentence, or in the alternative, to grant him a furlough; so that he may weather the storm at home before reporting to complete his unfinished term of imprisonment. It may literally save his life, and others.

## II. DISCUSSION

**A. LEGAL STANDARD** -- Pursuant to 18 U.S.C. Section 3582 (c) (1) (A) (i), a Court may modify a term of imprisonment "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment ... after considering the factors set forth in Section 3553 (a) to the extent that they are applicable, if it

finds that— (i) extraordinary and compelling reasons warrant such a reduction." 18 USC Section 3582 (c) (1) (A) (i).

**B. OFFENSE AND SENTENCE** – On April 25, 2017, the Defendant was charged, along with five others, with conspiring to distribute, and possessing with the intent to distribute, 280 grams and more of crack cocaine, 500 grams and more of cocaine, oxycodone in the form of Percocet tables, and marijuana, in violation of 21, United States Code, Sections 841 (b) (1) (A), (B), (C) and (D). **(Dk #2)**. The Defendant pled guilty on September 26, 2018, to the lesser included offense of Count One of the Indictment, conspiring to possess 28 grams and more of crack cocaine, in violation of Title 21, United States Code, Section 846 and 841 (b) (1) (B), before the United States Magistrate Judge Stewart D. Aaron. This Court accepted the defendant plea on November 2, 2018. On September 10, 2019, the Defendant was sentenced to a term of imprisonment of 70-month on Count One and a term of supervised release of 4 years.

**C. COVID-19 VIRUS COMPELS IMMEDIATE REDUCTION OF THE DEFENDANT'S SENTENCE TO PROTECT HIM AND OTHERS FROM THE DEADLY VIRUS** - The high risk of contracting COVID-19 due to the conditions at MDC Brooklyn, where the Defendant is currently housed, compels immediate reduction of his sentence by 51 months so that he can be immediately transferred to home confinement or, furlough to home confinement. The circumstances created by COVID-19 present "extraordinary and compelling reasons" that "warrant such a reduction." 18 USC Section 3582(c) (1) (A) (i).

As of April 20, 2020, there were 770,564 confirmed cases in the United States, leading to at least 41,114 deaths. By the time the Court reviews this application that number will have significantly increased. Ohio has not seen the confirmed cases and death as other states, but it has 242,786 confirmed cases with 17,671 deaths as of April 20, 2020.

The Centers for Disease Control and Prevention (CDC) shows that nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old. Everybody must take every necessary action to protect vulnerable populations and the community at large. Conditions at MDC Brooklyn create the ideal environment for the transmission of the contagious disease. Residents cycle in and out of one of the largest federal correctional institutions in the Bureau from all over the nation, and people who work in the facilities leave and return daily, without adequate screening. According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[1] The Defendant is 22 years old.

House Democrats on the Judiciary Committee sent a letter to Attorney General William Barr on Monday demanding that he try to:

> "release as many prisoners as possible" due to the rapid spread of the coronavirus across the U.S. Chairman Jerry Nadler (D-NY) and subcommittee chairwoman Karen Bass (D-CA) did not stop there with their demands as they told Barr to consider releasing prisoners regardless of the severity of the crimes for which they were convicted and regardless of the type of facility they were housed in.
> "We call on you, in the most urgent of terms, to do the right thing and exercise [authority to modify sentences of prisoners who present 'extraordinary and compelling reasons'] and immediately move to release medically-compromised, elderly, and pregnant prisoners in the custody of the [Bureau of Prisons]," the Democrats wrote. "In addition, we urge that you use every tool at your disposal to release as many prisoners as possible, to protect them from COVID-19."

Article by Ryan Saavedra with the DailyWire.com on March 31, 2020.

---

[1] "Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020).

6

COVID-19 spreads mainly between people who are in close contact with one another (within about 6 feet) through respiratory droplets produced when an infected person coughs or sneezes. Individuals who contract the virus may not show symptoms for 10-12 days, but they are still contagious during that time and may infect others with whom they interact. This "asymptomatic transmission" makes the virus unusually dangerous as carriers can be unaware of their own infection. It is for this reason that given our lack of any cure or vaccine, social distancing is the only method by which to slow the spread of COVID-19. The Defendant does not pose a threat to the community in which he will reside or to the community at large.

Social distancing and staying at home are particularly vital because studies suggest that coronaviruses (including preliminary information on the COVID-19 virus) may persist on surfaces for a few hours or up to several days. "According to a recent study published in the New England Journal of Medicine, SARS-CoV-2, the virus that causes COVID-19, can live in the air and on surfaces between several hours and several days. The study found that the virus is viable for up to 72 hours on plastics, 48 hours on stainless steel, 24 hours on cardboard, and 4 hours on copper. It is also detectable in the air for three hours. Hence, the rapid spread of COVID-19 can result from fomites (objects or material that are likely to carry infections), such as elevator buttons, restroom taps, and clothes.

Some federal judges have begun taking action in light of the extraordinary danger inmates face in BOP facilities. On March 18, 2020, Judge Nathan reversed her prior denial of bail, citing the high risk of COVID-19 infection in jails: [S]ince the March 6 hearing, the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent. United States v. Stephens, No. 15-cr-95 (AJN), 2020 US Dist LEXIS 47846, at *3-5 (SDNY Mar. 18, 2020). See, e.g., United States v. Brannan, No. 4:15-CR-80-01 (S.D. Tx. Apr.

7

2, 2020) (though not reflected in order, emergency motion was granted on same day of filing for prisoner who had served only 9 months of a 36-month sentence for fraud at FCI Oakdale and had not exhausted BOP remedies). United States v. Colvin, No. 3:19cr179 (JBA), 2020 WL 1613943 (D. Conn. Apr. 2, 2020) ("She has diabetes, a 'serious ... medical condition,' which substantially increases her risk of severe illness if she contracts COVID-19.... Defendant is 'unable to provide self-care within the environment of' FDC Philadelphia in light of the ongoing and growing COVID-19 pandemic because she is unable to practice effective social distancing and hygiene to minimize her risk of exposure, and if she did develop complications, she would be unable to access her team of doctors at Bridgeport Hospital. In light of the expectation that the COVID-19 pandemic will continue to grow and spread over the next several weeks, the Court concludes that the risks faced by Defendant will be minimized by her immediate release to home, where she will quarantine herself."); and, United States v. Foster, No. 1:14-cr-324-02 (M.D. Pa. Apr. 3, 2020) ("The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment 'extraordinary and compelling,' and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting COVID-19 from which he would "not expected to recover." USSG SS 1B1.13. No rationale is more compelling or extraordinary.").

Finally, the Defendant is willing to implement any additional measures deemed necessary to reassure the Court and the Bureau of Prisons of his whereabouts and compliance with his sentence, including, but not limited to, wearing an ankle monitor.

Accordingly, the Defendant respectfully requests this Honorable Court to reduce the Defendant's sentence by 51 months so that he may be immediately placed by the BOP in home confinement.

**D. EXHAUSTION SHOULD BE EXCUSED AS FUTILE AND BECAUSE DOING SO WILL CAUSE IRREPARABLE INJURY** -- Due to the recent enactment of 18 U.S.C. Section 3582 (c) (1) (A) (i) as part of the First Step Act, there is virtually no case law interpreting the exhaustion requirement. However, in general, "[e]xhaustion of administrative remedies is required 'for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy.'" Moscato v FBOP, 98 F.3d 757, 761-62 (3rd Cir. 1996).

Courts, however, have excused exhaustion when it would not promote these goals. See, e.g. Gambino v. Morris, 134 F.3d 156, 171 (3d Cir. 1998) (Roth, J., concurring) (exhaustion excused upon petitioner showing futility); Carling v. Peters, No. Civ. A 00-CV-2958, 2000 U.S. Dist. LEXIS 10288, WL 1022959, at *2 (E.D. Pa. July 10, 2000) (exhaustion excused where delay would subject petitioner to irreparable injury);" and, Lindsay v. Williamson, 2007 US Dist. LEXIS 54310, at *6-7 (MD Pa 2007). Additionally, Courts have found that, despite the exhaustion requirement, they may issue Orders under the above circumstances, "because the exhaustion doctrine is based upon comity and not jurisdiction", Williams v. James, 770 F Supp 103, 106 (WDNY 1991) (citing Wheeler v. Kelly, 639 F. Supp. 1374, 1377 (E.D.N.Y. 1986), aff'd, 811 F.2d 133 (2d Cir. 1987)).

Additionally, several federal appellate courts, in interpreting a different portion of 18 U.S.C. Section 3582 (c) have held that the language of that subsection is non-jurisdictional. United States v. Taylor, 778 F.3d 667, 671 (7th Cir. 2015) ("[Section] 3582 is not part of a jurisdictional portion of the criminal code but part of the chapter dealing generally with sentences of imprisonment. . . [n]or is subsection (c) phrased in jurisdictional terms."); see also

9

United States v. Calton, 900 F.3d 706, 711 (5th Cir. 2018) (citing United States v. Caraballo-Martinez, 866 F.3d 1233, 1243 (11th Cir. 2017); United States v. Anderson, 772 F.3d 662, 667 (11th Cir. 2014); United States v. Beard, 745 F.3d 288, 291 (7th Cir. 2014); United States v. Trujillo, 713 F.3d 1003, 1005 (9th Cir. 2013); see also United States v. Green, 886 F.3d 1300, 1306 (10th Cir. 2018).

Accordingly, subsection (c) should not be understood to impose jurisdictional requirements. While prior cases governing compassionate release under earlier versions of the statute may create an ongoing requirement that defendants request that the BOP file compassionate release motions before filing on their own, the waiting period cannot be understood as a jurisdictional requirement. Here, we submit that the Court may Order the requested sentence modification without requiring the Defendant to exhaust his administrative remedies because exhaustion would be futile and because it would cause irreparable injury as discussed above.

### III. CONCLUSION

The Defendant is very remorseful for his criminal conduct, but he requests this Honorable Court to save his life by reducing his sentence by fifty-one months; so that, he may not become a COVID-19 statistics, or, in the alternative, to allow to go to home confinement on furlough with the unfinished portion of the sentence to completed when the COVID-19 is under control.

For the foregoing reasons, the Defendant respectfully requests this Honorable Court to modify the Defendant's sentence by 51 months so that he will be immediately placed on home confinement. The Defendant submits that this is the appropriate and humane approach to dealing with this pandemic and the global emergency of this magnitude.

Dated: 04-23-2020

                                                                                                                 _____

Hiram Collazo # 79046-054
Metropolitan Detention Center
P. O. Box 329002
Brooklyn, NY 11232